N.Y.S.D. Case #
15-+cv-8140(ER)

17-3218-cv
Klein v. Cadian Capital Mgmt., LP

1            UNITED STATES COURT OF APPEALS
2                FOR THE SECOND CIRCUIT

3                ————————————

4

5                   August Term, 2017

6

7  (Argued: May 14, 2018                Decided: October 2, 2018)

8

9                 Docket No. 17-3218-cv

10

11               ————————————

12

13  TERRY KLEIN, derivatively on behalf of QLIK TECHNOLOGIES, INC.,

14

15                  *Plaintiff-Appellant*,

16

17         v.

18

19  QLIK TECHNOLOGIES, INC.,

20

21                  *Defendant-Appellant*,

22

23         v.

24

25  CADIAN CAPITAL MANAGEMENT, LP, CADIAN FUND LP, CADIAN

26  MASTER FUND LP, CADIAN GP, LLC, CADIAN CAPITAL MANAGEMENT

27  GP, LLC, ERIC BANNASCH,

28

29                 *Defendants-Appellees*.

30

31               ————————————

32

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: Oct 02 2018

CERTIFIED COPY ISSUED ON 10/02/2018

1    Before:  POOLER, LOHIER, *Circuit Judges*, and SULLIVAN, *District Judge*.[1]
2
3            Appellant Terry Klein brought this suit derivatively as a shareholder of

4    Qlik Companies. She alleges that Appellees, referred to collectively as the

5    "Cadian Group," owned more than ten percent of Qlik and engaged in short-

6    swing transactions in that stock in 2014, in violation of Section 16(b) of the

7    Securities Exchange Act. While the action was stayed for reasons irrelevant to

8    this appeal, Qlik was bought out in an all-cash merger, causing Klein to lose any

9    financial interest in the litigation. After the stay was lifted, the Cadian Group

10   moved to dismiss the action for lack of standing. Klein moved to substitute Qlik

11   under Rule 17(a)(3) of the Federal Rules of Civil Procedure. The District Court for

12   the Southern District of New York (Ramos, *J.*) found that Klein's lack of standing

13   deprived it of jurisdiction to do anything other than dismiss the suit and that, in

14   any case, Qlik could not be substituted under Rule 17 because it had not made an

15   "honest mistake" when it failed to join the action earlier. We disagree. When

16   Klein lost her personal stake in the litigation, the only jurisdictional question was

17   whether the case had become moot. A district court has jurisdiction to determine

---

[1] Judge Richard J. Sullivan, United States District Court for the Southern District of New York, sitting by designation.

1  whether substituting a plaintiff would avoid mooting the action. Rule 17(a)(3)

2  allows substitution of the real party in interest so long as doing so does not

3  change the substance of the action and does not reflect bad faith from the

4  plaintiffs or unfairness to the defendants. There is no "honest mistake"

5  requirement beyond that. The district court should have substituted Qlik and

6  denied the Cadian Group's motion to dismiss for lack of jurisdiction.

7       Vacated and remanded.

8

9  JUDGE RAYMOND J. LOHIER, JR. dissents in a separate opinion.

10       _____

11       PAUL DENNIS WEXLER (Glenn F. Ostrager, *on the*
12       *brief*), New York, N.Y., *for Appellants*.
13
14       JAMES E. TYSSE, Akin Gump Strauss Hauer & Feld
15       LLP (Z.W. Julius Chen, Douglas A. Rappaport, Robert
16       H. Pees, Jessica Oliff Daly, *on the brief*), Washington,
17       D.C. *for Appellees*.
18

3

1    POOLER, *Circuit Judge*:

2         Appellant Terry Klein brought this suit derivatively as a shareholder of

3    Qlik Companies. She alleges that Appellees, referred to collectively as the

4    "Cadian Group," owned more than ten percent of Qlik and engaged in "short-

5    swing" transactions in that stock in 2014, in violation of Section 16(b) of the

6    Securities Exchange Act. While the action was stayed for reasons irrelevant to

7    this appeal, Qlik was bought out in an all-cash merger, causing Klein to lose any

8    financial interest in the litigation. After the stay was lifted, the Cadian Group

9    moved to dismiss the action for lack of standing. Klein moved to substitute Qlik

10   under Rule 17(a)(3) of the Federal Rules of Civil Procedure. The District Court for

11   the Southern District of New York (Ramos, *J.*) found that Klein's lack of standing

12   deprived it of jurisdiction to do anything other than dismiss the suit and that, in

13   any case, Qlik could not be substituted under Rule 17 because it had not made an

14   "honest mistake" when it failed to join the action earlier.

15        We disagree. Klein's personal stake at the outset of the litigation

16   established her standing. When she lost her personal stake as the action

17   proceeded, the only jurisdictional question was whether the case had become

18   moot. A district court determining whether a case has become moot maintains

4

1  jurisdiction to determine whether a substitute plaintiff would avoid that result.

2  Rule 17(a)(3) allows substitution of the real party in interest so long as doing so

3  does not change the substance of the action and does not reflect bad faith from

4  the plaintiffs or unfairness to the defendants. There is no "honest mistake"

5  requirement beyond that. The district court should have substituted Qlik and

6  denied the Cadian Group's motion to dismiss for lack of jurisdiction.

7      Accordingly, we VACATE the district court's dismissal of the action for

8  lack of subject matter jurisdiction and REMAND for substitution of Qlik and

9  further proceedings consistent with this opinion.

10  **BACKGROUND**

11      Section 16(b) of the Securities Exchange Act requires corporate insiders,

12  including owners of more than ten percent of a company's stock, to disgorge

13  what are colloquially known as "short-swing profits," i.e., any profits made from

14  buying and selling or selling and buying within a six-month period a security

15  based on that company's stock. 15 U.S.C. § 78p(b). The statute imposes strict

16  liability on insiders likely to have access to insider information in order to "tak[e]

17  the profits out of a class of transactions in which the possibility of abuse was

18  believed [by the Congress that passed it] to be intolerably great." *Reliance Elec.*

5

1  *Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972). Suits under 16(b) can be brought

2  by the company that issues the relevant stock or, "if the issuer shall fail or refuse

3  to bring such suit within sixty days after request or shall fail diligently to

4  prosecute the same thereafter," by any "owner of any security of the issuer." 15

5  U.S.C. § 78p(b).

6    The Cadian Group allegedly owned more than ten percent of Qlik and

7  engaged in short-swing transactions in that stock in 2014. Klein purchased some

8  of Qlik's stock and made demand on Qlik on June 11, 2015. Qlik informed Klein

9  that it did not intend to bring an action, so Klein filed a complaint against the

10  Cadian Group on October 15.

11    The case was stayed on November 20 pending resolution of a motion in a

12  related case brought by the same plaintiff's attorneys against the same group of

13  defendants who apparently engaged in similar transactions with another

14  company. In the meantime, a private equity company that is not a party to this

15  matter bought out Qlik in an all-cash merger. The agreement was signed on June

16  2, 2016, and checks were cut to shareholders on August 22.

17    On November 11, 2016, the Cadian Group requested permission to file a

18  motion to dismiss on the grounds that Klein no longer had standing after selling

1  her shares in the merger.[2] Four days later, Klein requested permission to file a

2  motion to substitute Qlik (now under new ownership) under Rule 17(a)(3) of the

3  Federal Rules of Civil Procedure. The district court granted the Cadian Group's

4  motion to dismiss and denied Klein's motion to substitute. *Klein*, 2017 WL

5  4129639, at *11. The court reasoned that Klein's lack of continuing financial

6  interest in the litigation caused her to lose standing, which made the case moot.

7  *Id.* at *8. According to this logic, Klein's lack of standing rendered the court

8  powerless to rule on her motion to substitute. The district court found in the

9  alternative that Rule 17(a)(3) does not actually apply to this situation because

10  Klein did not make an "honest mistake" in failing to include Qlik as a plaintiff ab

11  initio. *Id.* at *10 & n.13. Klein and Qlik timely appealed.

12  **DISCUSSION**

13  The district court should not have hesitated to substitute Qlik. It has the

14  constitutional power to substitute a real party in interest to avoid mooting a case

15  and Rule 17(a)(3) is an appropriate procedural mechanism for doing so.

---

[2] The Cadian Group also argued that Klein did not have standing at the inception of the lawsuit, but the district court (correctly) rejected that argument and it is not at issue on appeal. *See Klein ex rel. Qlik Techs., Inc. v. Cadian Capital Mgmt., LP*, 15 Civ. 8140 (ER), 2017 WL 4129639, *5-6 (S.D.N.Y. Sept. 15, 2017).

1    **I.      The Jurisdictional Consequence of Klein's Loss of a Personal Stake**

2           It is an elementary lemma of constitutional interpretation that Article III,

3    Section 2 limits the power of federal courts to adjudicating "Cases" and

4    "Controversies." In practice this means that the judicial power to articulate the

5    law extends only to complaints from parties "seek[ing] redress for a legal

6    wrong." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). In civil matters, federal

7    courts will only hear from plaintiffs who clearly allege that one or more of a

8    defendant's actions led to an "invasion of [the plaintiffs'] 'legally protected

9    interest'" in a manner that makes it "likely that the injury will be redressed by a

10   favorable decision." *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (quoting

11   *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). We may, in short, only entertain

12   complaints from a complainant with a concrete stake—and not just a "keen

13   interest"—in the outcome of the litigation. *Hollingsworth v. Perry*, 570 U.S. 693,

14   700 (2013).

15          We have previously found that there is a case or controversy in a Section

16   16(b) case so long as the party bringing suit is either the corporation that issued

17   the securities in question or a current security holder of that corporation. *See*

18   *Donoghue v. Bulldog Inv'rs Gen. P'ship*, 696 F.3d 170, 175 (2d Cir. 2012). At this

8

1  stage of the litigation, nobody contests that Klein's interest in Qlik at the

2  initiation of the suit and until the moment of the buyout was sufficient to

3  empower the district court to hear her Section 16(b) action. The question in front

4  of us is what that court has the power to do now that Klein no longer has any

5  financial stake in Qlik.

6      The district court concluded that, once Klein was bought out, it lost all

7  power to do anything but declare that it no longer had subject-matter

8  jurisdiction. *Klein*, 2017 WL 4129639, at *10. It reasoned that a derivative plaintiff

9  in a Section 16(b) action who loses her stake in the corporation thereby loses her

10  standing to maintain the action, *id.*, which rendered "the only function remaining

11  to the court . . . that of announcing [its lack of jurisdiction] and dismissing the

12  cause."[3] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998) (quoting *Ex*

13  *parte McCardle*, 7 Wall. 506, 514 (1868)). According to the court below, "[w]hile it

14  may be true that courts have distinguished between standing and mootness, the

15  Supreme Court in analyzing whether a plaintiff would maintain some continuing

---

[3] Other district courts in this Circuit have analyzed similar cases similarly under the standing rubric. *See, e.g., Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 WL 4849146, at *3-6 (S.D.N.Y. Oct. 12, 2012).

financial stake in a Section 16(b) litigation has indicated that the applicable

doctrine is that of standing." *Klein*, 2017 WL 4129639, at *7 n.8 (internal quotation

marks omitted).

Reviewing this determination de novo, we hold that it was erroneous.

*Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.à.r.l.*, 790 F.3d 411, 417 (2d Cir.

2015). ("On appeal from a dismissal under Rule 12(b)(1) [including on mootness

grounds], we review the court's factual findings for clear error and its legal

conclusions *de novo*."). The district court's interpretation of the relevant

precedent is understandable given the sometimes-incautious way the word

"standing" has been used, but it is mistaken nevertheless. The consequences of

losing a stake in ongoing litigation are determined not by asking whether the

party losing its stake in the litigation has lost its *standing* but by asking whether

the action has become *moot*.

The case-or-controversy limitation on our jurisdiction, and its focus on

parties' stakes in the action, manifests in three distinct legal inquiries: standing,

mootness, and ripeness. Only the first two are at issue here. "[S]tanding doctrine

evaluates a litigant's personal stake as of the outset of litigation." *Altman v.

Bedford Cent. Sch. Dist.*, 245 F.3d 49, 70 (2d Cir. 2001) (quoting *Cook v. Colgate*, 992

10

1    F.2d 17, 19 (2d Cir. 1993)); *see also Lujan*, 504 U.S. at 569 n.4; *Gollust v. Mendell*, 501

2    U.S. 115, 124 (1991) (discussing Section 16(b) statutory standing as "limited only

3    by conditions existing at the time an action is begun"). Mootness doctrine

4    determines what to do "[i]f an intervening circumstance deprives the plaintiff of

5    a personal stake in the outcome of the lawsuit, at any point during litigation"

6    after its initiation.[4] *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013)

7    (internal quotation marks omitted); *see also United States v. Sanchez-Gomez*, 138 S.

8    Ct. 1532, 1537 (2018).

9         For many years, however, the term "standing" was also used to more

10   broadly connote "[a] party's right to make a legal claim or seek judicial

11   enforcement of a duty or right." *Standing*, Black's Law Dictionary (10th ed. 2014).

12   In other words, "standing" was sometimes used to refer to a particular Article III

13   inquiry and sometimes, more informally, as a synonym for the personal stake in

14   the litigation with which multiple areas of law concerns themselves. The more

---

[4] Ripeness doctrine, measured at the outset, is "designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements" when it is not yet clear if or how a plaintiff has been injured. *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (internal quotation marks omitted); *see also Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 121-22 (2d Cir. 2014).

11

1 informal use of "standing" can be found in some of the cases the district court

2 relied on.

3 *Gollust v. Mendell*, the leading case on who can sue under Section 16(b),

4 repeatedly refers to the breadth of "standing." *See* 501 U.S. at 123-25. But the

5 *Gollust* Court did not ask any constitutional questions; indeed, it avoided them.

6 *See id.* at 125-26 (stating that had Congress drafted Section 16(b) more broadly, it

7 would have raised "serious constitutional doubt," and relying on constitutional

8 avoidance to avoid determining the constitutional question). It was concerned

9 with a matter of statutory interpretation: to whom Section 16(b) provides a

10 private cause of action. The "standing" it was discussing was what used to be

11 called "statutory standing." The Supreme Court has since clarified that "what

12 has been called 'statutory standing' in fact is not a standing issue, but simply a

13 question of whether the particular plaintiff 'has a cause of action under the

14 statute.'" *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d

15 Cir. 2016) (quoting *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S.

16 118, 128 (2014)). It is precisely "to avoid incorrectly portraying them as

17 jurisdictional requirements" that we now avoid the term "statutory standing"

18 when discussing the sorts of requirements found in Section 16(b) on which the

1    *Gollust* court focused. *See Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104,

2    111 (2d Cir. 2018); *see also Am. Psychiatric Ass'n*, 821 F.3d at 359 ("Because the

3    Supreme Court made clear in *Lexmark* that the 'statutory standing' appellation is

4    'misleading' and 'a misnomer,' we avoid this appellation going

5    forward."(citation omitted) (quoting *Lexmark*, 572 U.S. at 127-28 & n.4)). If *Gollust*

6    had been written after the 2014 *Lexmark* decision, it would surely not have used

7    "standing" in describing the object of its analysis.

8       An infelicitous phrasing in one of this Circuit's cases adds to the confusion.

9    In *Altman*, we reaffirmed the principle that while "standing doctrine evaluates a

10    litigant's personal stake as of the outset of the litigation, the mootness doctrine

11    ensures that the litigant's interest in the outcome continues to exist throughout

12    the life of the lawsuit." 245 F.3d at 70 (internal quotation marks omitted). Just

13    before we did so, however, we seemed to conflate the two doctrines, saying "if

14    the plaintiff loses standing at any time during the pendency of the proceedings in

15    the district court or in the appellate courts, the matter becomes moot." *Id.* at 69.

16    This is another instance of "standing" being used to mean something other than

17    the constitutional minimum a party must establish at the onset of a case. It is

1    "standing" not in its constitutional sense, but as a stand-in for "personal stake in

2    the litigation."

3        These terminological distinctions may seem mere taxonomic fussiness. But

4    the standing and mootness inquiries "differ in respects critical to the proper

5    resolution of" cases like this one. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

6    *(TOC), Inc.*, 528 U.S. 167, 180 (2000). "Standing doctrine functions to ensure,

7    among other things, that the scarce resources of the federal courts are devoted to

8    those disputes in which the parties have a concrete stake. In contrast, by the time

9    mootness is an issue, the case has been brought and litigated, often . . . for years."

10   *Id.* at 191. Thus, "[t]o abandon the case at an advanced stage may prove more

11   wasteful than frugal." *Id.* at 191-92. It may also prove prejudicial to non-parties

12   who forewent filing a separate suit on the same issues in reliance on the outcome

13   of the suit already brought. And it may enable defendants to game the judicial

14   system by providing some sort of ephemeral relief to named plaintiffs to avoid

15   the risk of more substantial relief being awarded to other real parties in interest.

16       The difference between mootness and standing has been most evident in

17   class action jurisprudence. Named plaintiffs in class litigation represent not

18   just—or even primarily—themselves, but also those sufficiently similarly

14

situated that Rule 23 enables judicial recognition of their shared interest.

Members of a class who are not named plaintiffs (and do not opt out) will be

bound by the result of the litigation. It is well established that their interest in the

outcome should not be ignored when circumstances deprive the party that

represents them of her interest. *See Sanchez-Gomez*, 138 S. Ct. at 1538 ("The

certification of a suit as a class action has important consequences for the

unnamed members of the class . . . [as] [t]hose class members may be bound by

the judgment and are considered parties to the litigation in many important

respects." (internal quotation marks omitted)). Accordingly, "[s]ubstitution of

unnamed class members for named plaintiffs who fall out of the case because of

settlement or other reasons" that would deprive them of standing if present at

the outset of litigation "is a common and normally an unexceptionable . . .

feature of class action litigation . . . in the federal courts." *Phillips v. Ford Motor

Co.*, 435 F.3d 785, 787 (7th Cir. 2006); *see also Lierboe v. State Farm Mut. Auto. Ins.

Co.*, 350 F.3d 1018, 1023 (9th Cir. 2003) (distinguishing between cases where

standing was lacking ab initio, where immediate dismissal is required, and

where a mootness issue arises, where "substitution or intervention might [be]

possible"); *Baxter v. Palmigiano*, 425 U.S. 308, 310 n.1 (1976) (allowing for such

15

1    substitution in a prisoner litigation case). *But see Symczyk*, 569 U.S. at 73-74

2    (distinguishing collective actions under the Fair Labor Standards Act from Rule

3    23 class actions for mootness purposes). Moreover, though a class technically

4    does not exist before it has been certified, "where the class is not certified until

5    after the claims of the individual class representatives have become moot,

6    certification may be deemed to relate back to the filing of the complaint in order

7    to avoid mooting the entire controversy." *Robidoux v. Celani*, 987 F.2d 931, 939 (2d

8    Cir. 1993); *see also Phillips*, 435 F.3d at 787 ("Strictly speaking, if no motion to

9    certify has been filed (perhaps if it has been filed but not acted on), the case is not

10   yet a class action and so a dismissal of the named plaintiffs' claims should end

11   the case . . . [b]ut the courts . . . are not so strict."). The Supreme Court has

12   allowed the United States to step in as a plaintiff when statutorily permitted

13   "despite the disappearance of the original plaintiffs and the absence of any class

14   certification." *Pasadena City Bd. of Educ. v. Spangler*, 427 U.S. 424, 430-31 (1976).

15   And substitution of a plaintiff whose individual claim has not been mooted is not

16   even always necessary after class certification unless there is reason to believe

17   that the class representative will no longer meet the requirements of Rule 23. *See*,

18   *e.g.*, *Turkmen v. Ashcroft*, 589 F.3d 542, 545-46 (2d Cir. 2009).

16

1    The Seventh Circuit has described these situations as "disregard[ing] the

2    jurisdictional void that is created when the named plaintiffs' claims are

3    dismissed." *Phillips*, 435 F.3d at 787. But one might more accurately say that there

4    is no jurisdictional void to disregard. A legal controversy is not like an electrical

5    circuit, such that a court's power switches off as soon as the personal stake of all

6    of the named parties on either side of the controversy drops below the legally

7    adequate threshold. Rather, Rule 17 contemplates that federal courts maintain

8    jurisdiction over an action in which a representative plaintiff has lost her stake

9    long enough to determine whether the concrete adverseness that existed at the

10   outset of the case can be maintained without undue prejudice to defendants.

11   Only if the answer is "no" is there no longer a live case in front of the court. And

12   only then must a court dismiss the matter for want of jurisdiction.

13        The dissent argues that recent Supreme Court precedent establishes that

14   this "more relaxed rule of mootness" applies "exclusively to class actions."

15   Dissent at 2. With all due respect, this is an overreading of the relevant

16   precedent. In *Symczyk*, the Supreme Court held only that a plaintiff-employee

17   who brings a proposed collective action under the Fair Labor Standards Act and

18   whose individual claim is mooted before any of her fellow employees opt into

17

the action may not be replaced with another plaintiff-employee to avoid mooting

the action. *See* 569 U.S. at 73-76. The Court reasoned that, unlike in a Rule 23 class

action, a FLSA collective action "does not produce a class with an independent

legal status" before other employees opt into the action. *Id.* at 75. In *Sanchez-*

*Gomez*, the Supreme Court rejected a flexible mootness inquiry in a criminal case

that did "not involve *any* formal mechanism for aggregating claims," not even

one "comparable to the FLSA collective action." 138 S. Ct. at 1539.

What *Symczyk* and *Sanchez-Gomez* teach is that whether the interests of

non-named interested parties are to be considered in determining whether to

dismiss a case as moot depends on whether those parties have a "legal status

separate from the interest asserted by the named plaintiff." *Id.* at 1538 (quoting

*Symczyk*, 569 U.S. at 74). And whether non-named parties have that status

"turn[s] on the particular traits" of the action in front of the court. *Id.* Ours is not

the easy question of whether a derivative action is a class action or not but the

harder question of whether a derivative action is like a class action in the

relevant ways.

We think it is. Like a class action—but unlike a pre-certification FLSA

collective action as understood by the Supreme Court—a derivative action

18

involves a representative plaintiff. Under both Rule 23, governing class actions,

and Rule 23.1, governing derivative actions, a plaintiff seeking to bring suit must

establish that the Federal Rules allow her to formally represent the interests of

others. Fed. R. Civ. P. 23, 23.1. A derivative action, like a class action, is thus "an

'exception to the usual rule that litigation is conducted by and on behalf of the

individual named parties only.'" *Sanchez-Gomez*, 138 S. Ct. at 1538 (quoting

*Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)). A corporation is "bound by the

judgment" of derivative litigation brought on its behalf and is "considered [a]

part[y] to the litigation in many important respects." *Id.* Since the dissent does

not deny these analogies, we are not persuaded by its assertion that a derivative

action is "even further afield" from class actions than FLSA collective actions.

Dissent at 3.

　　We also note that mootness doctrine counsels suspicion in situations in

which a defendant deprives a plaintiff of her stake in the litigation. For instance,

when a plaintiff seeks an injunction, a defendant who voluntarily ceases the

challenged behavior calls into question whether there is any way to redress the

injury alleged. A rigid view of mootness would dismiss such an action. But it is

well settled that "a defendant's voluntary cessation of a challenged practice does

not deprive a federal court of its power to determine the legality of the practice."

*Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 603 (2d Cir. 2016) (quoting *City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982)). To prevent a defendant from strategically pausing their wrongdoing, getting a case dismissed as moot, and then beginning it again after the suit ends (potentially resulting in a new suit), federal law places the burden on the *defendant* who has voluntarily ceased her wrongdoing to prove that mootness should result. Such a defendant has "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur," *Friends of the Earth*, 528 U.S. at 190, and that "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation,"[5] *Granite State Outdoor Advert., Inc. v. Town of Orange*, 303 F.3d 450, 451 (2d Cir. 2002) (internal quotation marks omitted). Similarly, a defendant to a class action may not moot a case simply by offering a settlement equivalent to the full potential value of the individual claims of class representatives. *See Campbell-Ewald Co. v. Gomez*, 136 S.

---

[5] Moreover, dismissing a case as moot because a defendant has voluntarily ceased behavior that allegedly violates a plaintiff's rights is a discretionary matter. *See In re Charter Commc'ns, Inc.*, 691 F.3d 476, 483 (2d Cir. 2012).

20

Ct. 663, 670-71 (2016). *But see Symczyk*, 569 U.S. at 72-73 (leaving open whether

this rule applies to FLSA actions).

There is no evidence of any skullduggery in this case, but the rule we

announce today will surely apply to cases where there has been. Dismissing

Klein's claim without further inquiry would leave us powerless to address a

defendant's attempt to avoid liability by buying out derivative plaintiffs in future

cases. And strategic buyouts are not unheard of in the Section 16(b) context. Take

*Gollust* itself for instance. Before that case made it to the Supreme Court, it

passed through this Circuit. *See Mendell ex rel. Viacom, Inc. v. Gollust*, 909 F.2d 724

(2d Cir. 1990). While "we decline[d]—in keeping with §16(b)'s objective analysis

regarding defendants' intent—to inquire whether the merger was orchestrated

for the express purpose of divesting plaintiff of standing," we could not "help

but note that the . . . merger proposal occurred after plaintiff's § 16(b) claim was

instituted," which made "the danger of such intentional restructuring to defeat

the enforcement mechanism incorporated in the statute . . . clearly present." *Id.* at

731. We observed that "a rule that allows insiders to avoid § 16(b) liability by

divesting public shareholders of their cause of action through a business

reorganization would undercut the function Congress planned to have

21

1    shareholders play in policing such actions." *Id.* The Supreme Court quoted this

2    observation with approval in announcing its interpretation of Section 16(b). *See*

3    *Gollust*, 501 U.S. at 120 n.5. Today we observe, in parallel fashion, that a mootness

4    doctrine that allows those accused of securities fraud to have a suit promptly

5    dismissed by buying out a derivative plaintiff would undercut the purpose of

6    derivative litigation under Rule 23.1 as well as courts' constitutional function of

7    resolving genuine disputes.

8          Thus, while the district court is correct that Klein lost her personal stake in

9    the litigation, it is incorrect that it has no ability to consider Klein's motion to

10   substitute Qlik.[6] Unlike a federal court presented with a plaintiff who has no

11   standing, a federal court considering whether a case has become moot already

12   has jurisdiction over that case. When a representative plaintiff's ongoing stake in

13   the outcome is at issue, a federal court maintains its jurisdiction at least long

14   enough to determine whether the represented parties maintain an interest and

---

[6] Both Section 16(b) and Rule 23.1 require a continuing financial interest. Because the nature of the injury for constitutional purposes is in part delimited by the law underlying the claim in question, we need not determine whether a statute or federal rule that enabled Klein to maintain an action despite her loss of a financial interest in Qlik would run into constitutional problems.

whether a substitution could avoid mootness. So long as a proposed substitution

does not "come[] long after the claims of the named plaintiff[] were dismissed"

and does not alter the substance of the action, it should be considered as an

alternative to dismissal. *Phillips*, 435 F.3d at 787.

## II.     Substituting Qlik under Rule 17(a)(3)

Klein's proposed procedural route to substitution is Rule 17(a)(3) of the

Federal Rules of Civil Procedure. That Rule prohibits federal courts from

dismissing a case "for failure to prosecute in the name of the real party in interest

until, after an objection, a reasonable time has been allowed for the real party in

interest to ratify, join, or be substituted into the action." Fed. R. Civ. P. 17(a)(3).

"Crucially for statute of limitations purposes, the claim of the [substituted] real

party in interest . . . dates back to the filing of the complaint." *Cortlandt*, 790 F.3d

at 421. Qlik, the issuer of the securities at issue, is the real party in interest in this

derivative litigation. *See Donoghue*, 696 F.3d at 176 & n.5.

The district court ruled that "[e]ven if [it] had standing to entertain

[Klein's] motion, the motion would fail," because Rule 17(a) only allows

substitution when there has been an "honest mistake in selecting the proper

party," and Qlik's conscious decision not to litigate this action is not an "honest

23

mistake." *Klein*, 2017 WL 4129639, at *10 n.13. This determination was based on

an error of law, and thus constituted an abuse of the district court's discretion.

*See Cortlandt*, 790 F.3d at 417 ("A district court's decision whether to dismiss

pursuant to Rule 17(a) is reviewed for abuse of discretion." (internal quotation

marks omitted)).

In this Circuit, "Rule 17(a) substitution of plaintiffs should be liberally

allowed when the change is merely formal and in no way alters the original

complaint's factual allegations as to the events or the participants." *Advanced

Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 20 (2d Cir. 1997). Even if a

proposed substitution meets these requirements, it should be denied if it is being

proposed "in bad faith or in an effort to deceive or prejudice the defendants." *Id.*

at 21. A court may also deny a Rule 17(a) substitution if doing so would

otherwise result in "unfairness to defendants." *Id.* In sum, "[a]lthough the district

court retains some discretion to dismiss an action where there was no semblance

of any reasonable basis for the naming of an incorrect party, there plainly should

be no dismissal where substitution of the real party in interest is necessary to

avoid injustice." *Id.* at 20 (citation and internal quotation marks omitted).

24

1    Klein's proposed substitution of Qlik would alter none of the factual

2    allegations of the complaint. And there is no evidence that either Qlik or Klein

3    are acting or have acted in bad faith. As far as the record shows, both Qlik and

4    Klein honestly expected, based on the information they had at the time of Klein's

5    demand, that Klein would litigate on Qlik's behalf until judgment.

6    Circumstances intervened. A third-party investor bought Qlik, resulting both in

7    Klein losing her interest in the litigation and Qlik changing its corporate mind

8    about whether to litigate on its own behalf. We do not have even the slightest

9    reason to believe that this transaction was designed with its impact on this

10   litigation in mind. Neither Klein nor Qlik seems to have engaged in any trickery.

11   Both seem merely to have responded to the extra-litigation circumstances as they

12   presented themselves.

13       Further, we can discern no unfairness to the Cadian Group in allowing

14   substitution. Of course, if substitution were not allowed, they would no longer

15   have to defend this action or to worry about disgorging the profits from their

16   alleged short-swing trades. And this suit has gone on long enough that if Qlik

17   were to bring a new suit on these claims, the Cadian Group would have a statute

18   of limitations defense. No doubt it is unfortunate for them that Rule 17(a)(3) is

1    the only thing keeping them in court. Unfortunate, but not unfair. Ensuring that

2    an otherwise proper suit is not dismissed for want of a proper party when that

3    party is ready and willing to join the fray is the very purpose of Rule 17(a)(3). *See*

4    *Cortlandt*, 790 F.3d at 420-21. Rule 17's relation-back provision furthers that

5    purpose in situations like this one, where the course of the litigation has traveled

6    beyond the limitations period through no fault of the real party in interest or the

7    party representing them.

8         We need not determine whether Qlik committed an "honest mistake"

9    when it declined Klein's demand because, contrary to the dissent's suggestion

10    and the district court's holding, a plaintiff's honest mistake is not a precondition

11    for granting a Rule 17(a)(3) motion. Only in two opinions interpreting Rule 17 do

12    we ever refer to a plaintiff's honesty, and in neither do we declare that

13    establishing an "honest mistake" is necessary. In *Cortlandt*, we mentioned by way

14    of background that Rule 17(a)(3) "codifies the modern 'judicial tendency to be

15    lenient when an honest mistake has been made in selecting the proper plaintiff.'"

16    790 F.3d at 421 (quoting 6A Charles Alan Wright et al., Federal Practice

17    & Procedure § 1555 (3d ed. 2014)). But when it came time to enumerate 17(a)(3)'s

18    requirements, we relied, as we do today, on *Advanced Magnetics*, calling it the

"leading case interpreting the Rule." *See Cortlandt*, 790 F.3d at 422. In *DeKalb*

*County Pension Fund v. Transocean Ltd.*, we mentioned that substitution of the real

party in interest should be denied when that party has neither established that

"its tardy appearance was understandable or honest, nor pointed to a semblance

of any reasonable basis therefor." 817 F.3d 393, 412 (2d Cir. 2016) (internal

quotation marks omitted). This statement was dicta,[7] and, in any case, requiring

"a semblance of a reasonable basis" for a real party in interest's "tardy

appearance" is not the same as requiring that party to establish that she made an

"honest mistake."[8] Thus, both *Cortlandt* and *DeKalb* are entirely consistent with

*Advanced Magnetics*, which focused on "bad faith." 106 F.3d at 20-21. Establishing

that a real party in interest has made an honest mistake is, at most, one way of

---

[7] Contrary to the dissent's suggestion, *DeKalb*'s conclusion that the original plaintiff lacked standing and the court thus lacked subject matter jurisdiction ab initio could not be an "alternative holding." *See* Dissent at 7. "[I]n the absence of a plaintiff with standing . . . there [is] . . . no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise." *Cortlandt*, 790 F.3d at 423. Whether the real party in interest made a mistake does not even enter into consideration.

[8] The dissent suggests that these two concepts are the same. Dissent at 8. If so, then it seems the main focus of disagreement is the narrow question of whether Qlik had any semblance of a reasonable basis for failing to join the suit earlier. We think Qlik exhibited at least "minimal diligence" in the circumstances of this case (for the reasons articulated above); our dissenting colleague does not.

1   making clear that her failure to join the suit at a previous stage of the litigation[9]

2   was not "deliberate or tactical." *Id.* Whether or not it was an "honest mistake" for

3   Qlik not to join this suit at its outset (or at any point prior to the Rule 17 motion),

4   it did not act in bad faith.

5        Finally, we conclude that substituting Qlik here is "necessary to avoid

6   injustice," *id.* at 20 (internal quotation marks omitted), because a rule disallowing

7   substitution in these circumstances would contravene the purpose of shareholder

8   derivative suits. A company that rejects a demand to sue does so with the

9   knowledge that a shareholder can sue on its behalf. Unlike in the class action

10   context, the filing of a derivative action does not toll the statute of limitations on

11   the substantive cause of action so that a company can intervene if a shareholder

12   loses her interest in the suit (legal or otherwise). *See Cal. Pub. Emps.' Ret. Sys. v.*

13   *ANZ Sec., Inc.*, 137 S. Ct. 2042, 2051-54 (2017) (discussing the equitable tolling rule

14   in the class context and distinguishing it from securities actions governed by the

15   Securities Exchange Act's statutes of repose); *SRM Global Master Fund Ltd. P'ship*

---

[9] In asking why a real party in interest did not join the suit earlier, a court need not only focus on the time at which the suit was brought (or at which demand was rejected). Bad faith in failing to join at *any* prior point in the litigation can call into question the propriety of allowing substitution.

1   *v. Bear Stearns Co. L.L.C.*, 829 F.3d 173, 176-77 (2d Cir. 2016) (same). Thus, if a

2   company were disallowed from joining a suit under Rule 17(a)(3) merely because

3   it had rejected a shareholder's demand, its ability (and the ability of its other

4   shareholders) to recover assets of which it was illegally deprived would stand or

5   fall with the continuing financial interest of the representative shareholder. Other

6   shareholders would have to maintain separate derivative actions to avoid having

7   their investment depend on the vicissitudes of that litigation, resulting in a

8   "needless multiplicity of actions." *Crown, Cork & Seal Co. v. Parker*, 462 U.S. 345,

9   351 (1983). Companies would reasonably doubt whether relying on a derivative

10  shareholder to protect their interests would be prudent, undermining Rule 23.1

11  and the policies it furthers.

12                              **CONCLUSION**

13          For the foregoing reasons, we VACATE the district court's dismissal of this

14  action and REMAND for substitution of Qlik and further proceedings consistent

15  with this decision.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit

29